# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
## No. 18-1621V

| | |
|---|---|
| MICHELE NELSON RUPPERT,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: November 30, 2023<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Guillain-Barré Syndrome<br>(GBS) |

*Michael Arvin Firestone, Marvin Firestone, MD, JD, and Associates, San Mateo, CA, for Petitioner.*

*Jennifer Leigh Reynaud, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION AWARDING DAMAGES[1]

On October 19, 2018, Michele Nelson Ruppert filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered from Guillain-Barré syndrome ("GBS") as a result of an influenza ("flu") vaccine she received on October 26, 2015. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters, and although Respondent conceded entitlement, the parties were not able to settle damages.

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount of **$189,739.55, representing $180,000.00 for her actual pain**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at   https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

**and suffering, $25.03 for past unreimbursed expenses, and $9,714.52 for past lost wages.**

## I.      Relevant Procedural History

On November 21, 2019 (approximately 13 months after initiation), Respondent filed a Rule 4(c) Report conceding entitlement. ECF No. 25. A Ruling on Entitlement was subsequently issued on November 26, 2019. ECF No. 26. After attempting to resolve the issue of compensation for more than a year, the parties informed me in June 2022 that they were unable to reach an agreement. ECF No. 52. On September 21, 2022, Petitioner filed a Motion for Decision Regarding Petitioner's Damages ("Mot."). ECF No. 60. Respondent filed a response ("Resp.") on December 21, 2022. ECF No. 68. Petitioner's Motion is now ripe for resolution.

Petitioner argues that an award of $250,000.00 in past and future pain and suffering is appropriate as Petitioner's "vibrant and full life was utterly taken from her by her GBS." Mot. at 28. In addition, Petitioner requests reimbursement for out-of-pocket expenses and medical mileage of $412.56, anticipated out-of-pocket expenses of $16,581.94, past lost wages of $65,144.50, and future lost wages of $123,166.09. *Id.* at 24-28.

Respondent, by contrast, argues that an award of $145,000.00 in pain and suffering is appropriate due to Petitioner's limited course of treatment for her GBS. Resp. at 21. Respondent also disputes the amounts requested by Petitioner for out-of-pocket expenses and past lost wages, while denying her right to any future sums at all. *Id.* at 20.

## II.     Relevant Facts

### A.  Medical History

On October 26, 2015, Petitioner, who was 54 years old at the time, received a flu vaccination during a visit to her primary care provider ("PCP") in Santa Rosa, California. Ex. 2 at 7. Immediately before her vaccination, Petitioner had been suffering from weight loss, diarrhea, and an elevated white blood count. Ex. 2 at 92, 234, 300-01.

Petitioner went to the emergency room a little more than three weeks later, on November 19, 2015, reporting numbness and tingling in her hands for the previous three days, which progressed to her lower back, hips and legs, causing difficulty walking. Ex. 2 at 119. She was admitted and diagnosed with GBS based on her clinical symptoms and elevated protein in her cerebral spinal fluid. *Id.* at 240, 262. Petitioner suffered from ataxia, discoordination in her limbs, reduced reflexes, proprioceptive impairment, and lower

extremity weakness. *Id*. at 234-35. She was treated with a five-day course of IVIG. *Id*. at 263.

During her hospitalization, Petitioner was found to have a stricture of her sigmoid colon from chronic diverticulitis, which required an open abdominal surgery on November 30, 2015, and then a second surgery with an ileostomy on December 5, 2015. *Id*. at 735, 737. She later suffered from complications of surgery, including several intra-abdominal abscesses and portal vein thrombosis, and tachycardia, and spent several days in the intensive care unit. *Id* at 323, 720-21.

Petitioner was discharged to a skilled nursing facility on December 21, 2015, after a 32-day hospitalization. Ex. 2 at 161-62. She remained in inpatient rehab through January 27, 2016 (an additional 37 days), when she was discharged to her home. *Id*. at 2326. Upon discharge, she continued to use a cane to walk and fatigued easily, but was "feeling better." *Id*. at 2335-36. Petitioner was not on any medications for her GBS at the time. *Id*. at 2326-27.

Petitioner had a physical examination on February 2, 2016 (about three months after her vaccination) to prepare for surgery to close her ileostomy. Ex. 2 at 2331-38. She reported that her ability to walk had improved, but she still tired easily and had ongoing gastrointestinal symptoms. *Id*. at 2335. On exam, Petitioner had gait issues, and still used a cane. *Id*. Petitioner was hospitalized for the surgery from February 12-15, 2016. *Id*. at 2482.

Petitioner had another surgery on April 3, 2017, to repair a hernia caused by her ileostomy. Ex. 2 at 2891. During the pre-operative exam, Petitioner reported her history of GBS and residual tingling in her hands for the first time in over a year. *See Id*. at 2855, 2912.

Six months later, Petitioner sought treatment for neurological symptoms, including fatigue, confusion, and "slight balance problems." Ex. 3 at 31. Petitioner noted that she had begun to use her cane again at work. *Id*. Petitioner's complaints were evaluated by her neurologist on October 30, 2017 (two years after her vaccination). Id. at 49-51. She also complained of right hip and buttock pain, left ankle pain, unsteadiness, especially in the dark, intermittent numbness in her fingertips, forgetfulness, and fatigue. *Id*. at 50. Petitioner was noted to walk well without her cane, with some discomfort/stiffness in her right hip and "very very slight difficulty with tandem." *Id*. Her reflexes were normal and her exam showed no dementia. *Id*. at 50-51. On November 1, 2017, the neurologist confirmed that Petitioner's blood work was normal and that she "expected [Petitioner] to continue to do well neurologically." *Id*. at 81.

On November 1, 2017, Petitioner visited a new primary care provider, with complains of right hip and lower back pain that had gradually worsened over the past few weeks. Ex. 3 at 66-67. An x-ray showed moderate generative changes in Petitioner's hip, which the doctor believed was causing her symptoms. *Id*. at 111, 117. On November 12, 2017, Petitioner was diagnosed with obstructive sleep apnea after a sleep study. Ex. 3 at 126. On December 31, 2017, Petitioner was treated for injuries, including left shoulder and upper back pain, sustained in fall. *Id*. at 141.

On August 24, 2018, almost three years after her vaccination, Petitioner returned to her PCP with complaints of bilateral foot pain. Ex. 4 at 11-12. She described an acute injury to her right ankle and chronic pain in her left foot that had worsened in the last year. *Id.* Petitioner declined physical therapy. *Id*.

On September 8, 2018, Petitioner went to the emergency room with a cough and shortness of breath. Ex. 5 at 9. She had an anaphylactic reaction to a medication and was admitted to the intensive care unit. *Id*. at 12-13. She was discharged to her home on September 11, 2018 with diagnoses of bacterial pneumonia, sepsis, emphysema, asthma, and obstructive sleep apnea. *Id*. at 28-29. She followed up with an allergist on September 13, 2018, where a spirometry test revealed severe obstructive airway disease. Ex. 4 at 32.

On June 18, 2019, Petitioner returned to her PCP for an annual exam. Ex. 4 at 131-136. She was doing well and her physical exam was unremarkable. *Id*. at 131. She returned on August 2, 2019 with complaints of severe shoulder pain, without any numbness or tingling. *Id*. at 188-91.

On December 10, 2019, Petitioner had a telephone visit with a physical therapist regarding her left foot pain. Ex. 4 at 229-30. Petitioner stated that she had had such pain for two years since her GBS and that her right leg was weak, causing her to trip and land on her left foot. *Id*. Petitioner saw her PCP again on February 6, 2020 for her left foot pain. *Id*. at 250. She stated she had had "pain over left foot since diagnosis of GB syndrome as she was trying to put more weight on the left foot due to right sided GB syndrome." *Id*. at 251. On exam, Petitioner had full range of motion (with some pain) and normal strength in both legs. *Id*. at 254-55.

In March 2021, Petitioner returned to her allergist for advice about whether she should receive the Covid-19 vaccine. Ex. 13 at 247-52. She received the first dose on May 6, 2021. *Id*. at 356. A week later, she emailed her PCP with concerns, stating that while she had had "tingling in her fingers since GBS, she now had slight tingling in her right hand up to her wrist." *Id*. She was advised to get the second dose. *Id*  On June 7, 2021, Petitioner stated to her PCP that she had not gotten the second Covid-19 vaccine

4

dose because she had "severe tingling" in her hands after the first dose. *Id*. at 377. She also described "prickling from scalp to sole" after her first dose. *Id*.

On September 19, 2021, Petitioner had a visit with her PCP in which she complained about a "tingling sensation sometimes." Ex. 13 at 389. Petitioner described tingling in her hands after her Covid-19 vaccination that spread to her back, shoulder, head, face, neck, and legs. *Id*. She noted that it was "better now," and elected not to do the bloodwork ordered by the doctor to investigate the cause. *Id*. Petitioner explained that she is "unwilling to be vaccinated because [she doesn't] know if [she] could survive a second time. Ex. 1 at ¶69.

### B. Employment and Income History

Beginning in August 2015 (two months prior to her vaccination), Petitioner was employed as a childcare provider/teacher at "A Child's Way Schools" in Auburn, CA. Ex. 15. Petitioner earned $16.00 per hour and was offered work for "30 or more hours per week" at that time. *Id*. Petitioner described her new employment as her "dream job." Ex. 1 at ¶3. Prior to that employment, Petitioner worked two part-time jobs at restaurants. *See* Ex. 27.

Petitioner consistently worked more than 30 hours per week and would have continued to do so but for her illness (per the school director). Ex. 28; Ex. 21. Petitioner missed work due to her worsening GBS symptoms beginning on November 16, 2015 and did not return to work until the following academic year, in August 2016. Ex. 1 at ¶10, 48; *See also* Ex. 28-29. Between November 26, 2015 and August 27, 2016, Petitioner received disability income totaling $9,360.00.[3] Ex. 24.

When Petitioner returned to work on August 25, 2016,[4] she was scheduled to work three days per week and earned $17.00 per hour. Ex. 1 at ¶43, 48. Petitioner notes that she was "unable to maintain her pre-vaccine work hours due to residual symptoms of fatigue and mental fog." Mot. at 27. Petitioner's hours later increased to four days per week. Ex. 1 at ¶44. In March, 2018, she was offered a fifth day of work, but turned it down because she felt that she "needed that day to rest." Ex. 12 at 3. Petitioner was scheduled to work five days per week during the 2018-19 academic year, but asked to reduce it to four because she did not "feel capable of more." Ex. 1 at ¶44.

---

[3] Because Petitioner has not filed documentation of her disability application, it is unknown whether she received payments due to GBS, her GI surgeries, or both. However, Petitioner's gastrointestinal surgeon provided a letter stating that Petitioner had recovered by February, 2016, and that it was "unlikely that further disability was due to surgical or GI illness." Ex. 7.

[4] Petitioner returned to work on August 25, 2016, but did not work the remainder of the week due to her husband's death on August 26, 2016. Ex. 1 at ¶51-53.

During the 2018-20 academic years, Petitioner worked four days per week through February 26, 2020, earning $21.00 per hour. Mot. at 27. Petitioner did not return to employment after February 26, 2020.

### III.    Affidavits and Letters

#### A. *Petitioner's Statements*

Petitioner submitted an affidavit regarding her injury and damages. Ex. 1. She described the beginning of her illness as heaviness and tingling in her feet, tingling in her fingers, and a cold feeling in her hands. *Id*. at ¶7-8. She felt "bad and exhausted," and continued to deteriorate until she "tried to stand, [but] crumpled to the ground." *Id*. at ¶11-12. Her body seemed to be getting weaker during her hospitalization, with her body "numb" and "paralyzed." *Id*. at ¶14. She described her distress at requiring care from others. *Id*. at ¶15, 18.

During her stay in inpatient rehab, Petitioner experienced fatigue that caused her to sleep up to 16 hours per day. Ex. 1 at ¶28. Nevertheless, she was motivated to improve, progressing from a wheelchair to a walker and learning "new ways to care for [herself]." *Id*. at ¶27, 30, 32. Upon her release, Petitioner described certain ways in which she adapted her life to conserve energy. *Id*. at ¶33-37.

Petitioner describes her life through the years following her acute GBS illness. She stopped walking with a cane and returned to work approximately nine months after her vaccination. Ex. 1 at ¶51. She continued to experience fatigue, sleeping much of time she was not at work. *Id*. at ¶45. She described having to "sit on the mall's floor to rest during an hour of Christmas shopping" a year after her GBS diagnosis. *Id*. at ¶63. She describes ongoing sensation disturbances in her fingers and occasional weakness in her right leg. *Id*. at ¶65. Petitioner also attributes cognitive issues, including forgetfulness, to her GBS. *Id*. at ¶66. Petitioner states that she is "unwilling to be vaccinated" due to her fear of another illness. *Id*. at ¶69.

At the time of her illness, Petitioner youngest child was 16 years old. Ex. 1 at ¶5. A few months prior to her GBS, Petitioner obtained a new job working in a childcare program, a position she described as her "dream job" using her college education. Ex. 1 at ¶3-4. Th e position also increased her income. *Id*. at ¶5. Due to her GBS, she stopped working on November 16, 2015 and did not return until the following academic year in August 2016. *Id*. at ¶10, 48. At the time, Petitioner was scheduled to work three days per week, which was increased to four days per week the following year. *Id*. at ¶43. Petitioner

was offered five days per week during the 2018-19 academic year, but she declined because she didn't "needed that day to rest." Ex. 12 at 3.

In addition to her affidavit, Petitioner provided two letters written to her counsel in which she offers further statements about her experience with GBS and the years after her diagnosis. *See* Ex. 12, 39.[5] In the first letter, Petitioner states that her "tingling and balance issues" continue, but that her "tripping and weak leg" had resolved. Ex. 12 at 6. She noted that her fatigue had not improved and she continued to have memory problems. *Id*. In her letter from September 2022, Petitioner described extreme fatigue, having to sleep for more than a day after vacuuming part of her condo, washing her dishes, and making a video. Ex. 39 at 1. She explained how she lost her balance if she closed her eyes while standing. *Id*.

Petitioner also provided several videos in which she described her life before and after her GBS illness and showed her walking and doing other activities. *See* Ex. 42-51.

## B. *Physician Letters*

Petitioner provided several statements from her physicians regarding her GBS and other medical conditions. Petitioner's neurologist, Dr. Maria Christine Gonella, provided a letter on June 2, 2022, in which she described Petitioner's treatment. Ex. 6. Dr. Gonella stated that she last treated Petitioner for her GBS on October 30, 2017, when Petitioner's exam showed no weakness and "sensation to vibration was intact in fingers and toes." *Id*. at 1. She noted that Petitioner complained at that time of numbness in her fingertips and unsteadiness walking in the dark. *Id*. Petitioner was able to "walk without a cane, but still had very slight difficulty with tandem gait (one foot in front of the other)." *Id*.

Petitioner's gastrointestinal surgeon, Dr. Stephanie Dorene Pappas, provided a letter dated May 6, 2022, explaining Petitioner's colon surgery during her GBS hospitalization. Ex. 7. Dr. Pappas stated that although she has a "complicated surgical course that involved a colectomy and ileostomy" and an ileostomy reversal, "it is unlikely that her further disability from March until August 2016 was due to surgical or gastrointestinal related illness." *Id*. at 1.

On October 19, 2017, Petitioner's primary care provider, Dr. Swetha Thota, provided a letter stating that Petitioner "cannot receive the flu shot due to medical reasons." Ex. 22 at 1. On November 1, 2017, Dr. Thota provided a letter starting that Petitioner could "not receive measle vaccination due to medical reasons." Ex. 23 at 1.

## C. *Witness Statements*

Petitioner provided several statements from witnesses, including her employer, her co-workers, and her family and friends. Petitioner's former co-worker, Terry Dahlberg,

---

[5] The letter filed at Exhibit 12 is not dated. The letter filed at Exhibit 39 is dated "Sept. 2022."

provided a letter on August 26, 2018. Ex. 9. Ms. Dahlberg described Petitioner as "full of energy" while she worked two jobs in stores. *Id.* at 1. She noted that Petitioner did not drive and "walked everywhere." *Id.* Ms. Dahlberg also worked with Petitioner at her teaching job in 2015, describing the difference in her after her GBS hospitalization. *Id.* Ms. Dahlberg noted that she has a "different energy and physical level," tiring easily, walking with a cane, and experiencing "a lot of hip and joint pain." *Id.* She described Petitioner as "struggling through the pain." *Id.*

Petitioner's friend, Jennifer Juvland, provided a short statement on August 23, 2022, in which she stated that she had "noticed that [Petitioner] is not as sure footed as she used to be and cannot carry as much [groceries] as she could before [her illness]." Ex. 53.

Petitioner's neighbor, Debra Beougher, provided a statement on August 24, 2022, in which she stated that Petitioner "has unusual sleeping issues." Ex. 54 at 1. She described calling Petitioner at 5p.m. and Petitioner "is just getting out of bed." *Id.* She stated that Petitioner "basically is a shut in." *Id.*

Petitioner's mother, Polly Nelson, provided an email statement on August 23, 2022, in which she described Petitioner's life at that time as "much like [her] 88 year old mother." Ex. 55 at 1.

Paula Coe, director of A Child's Way Schools, Inc. (Petitioner's employer), provided a letter dated October 8, 2019. Ex. 21. Ms. Coe stated that Petitioner's hours at the time of her illness exceeded her guaranteed 30 hours per week, and likely would have continued to exceed the guarantee should she not have become ill. *Id.*

## IV.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical

formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g., Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[6] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a decision of the Court of Federal Claims several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* instead emphasized the importance of assessing pain and suffering by looking to the record evidence specific to the injured individual, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 595. Under this approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

### V.    Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all relevant times Ms. Ruppert was a competent adult with no impairments that would impact her awareness of her injury. Therefore, my analysis focuses primarily on the severity and duration of Petitioner's injury.

---

[6] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

When performing this analysis, I review the record as a whole, including all medical records, affidavits, and other material filed, as well as all assertions made by the parties in their filings. In her Motion, Petitioner cites to seven prior damages decisions involving GBS injuries and compares her own experience with GBS to those of the petitioners in those cases.[7] Mot. at 19-21. Petitioner argues that her course of GBS has been "severe" and has had "long-lasting" sequelae that justify an award of "at least $180,000.00 for her actual pain and suffering (and up to the statutory maximum based on her future expected pain and suffering an emotional distress)." *Id.* at 19.

In contrast, Respondent argues that the petitioners in the cited cases were "more severely injured" than Petitioner, who had "limited treatment for GBS." Resp. at 21. He argues that Petitioner's complicated medical history, including her abdominal surgeries during the acute phase of her GBS, "complicate" the analysis of Petitioner's pain and suffering. *Id.* He notes that "aside from the five-day course of IVIG near the beginning of her hospitalization and physical therapy throughout, Petitioner's testing and treatment focused entirely on her gastrointestinal issues and wound care." *Id.*

After reviewing the record in this case and considering the parties' written arguments, I find that the record best supports the conclusion that Petitioner suffered a moderately severe GBS injury which was substantially complicated by other serious medical conditions. I have noted in prior decisions that GBS constitutes a particularly alarming kind of vaccine injury – and that as a result, the pain and suffering award allowed should be a bit higher than average. *Gross v. Sec'y of Health & Human Servs.*, No. 19-0835V, 2021 WL 2666685 at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2021). At the same time, however, the considerations that always factor into a pain and suffering award – length of hospitalization, degree and number of procedures for treatment, post-treatment recovery, etc. – all impact the final figure to be awarded. Further, the extent to which Petitioner's concurrent medical conditions, and the treatments required for those conditions, may have impacted her treatment for GBS is a relevant consideration with respect to her pain and suffering award.

---

[7] In particular, Petitioner cited to *Wilson v. Sec'y of Health & Human Servs.*, No. 20-0588V, 2021 WL 5143925 (Fed. Cl. Spec. Mstr. Oct. 5, 2021) (awarding $175,000 in past pain and suffering); *McCray v. Sec'y of Health & Human Servs.*, No. 19-0277V, 2021 WL 4618549 (Fed. Cl. Spec. Mstr. Aug. 31, 2021) (awarding $180,000 in past pain and suffering); *Dillenbeck v. Sec'y of Health & Human Servs.*, 17-428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019) (awarding $180,857.15 for past and future pain and suffering); *Johnson v. Sec'y of Health & Human Servs.*, No. 16-135V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $180,000.00 for pain and suffering); *Fedewa v. Sec'y of Health & Human Servs.*, No. 17-1808V, 2020 WL 1915138 (Fed. Cl. Spec. Mstr. March 26, 2020) (awarding $180,000 for pain and suffering); *Devlin v. Sec'y of Health & Human Servs.*, No. 19-0191V, 2020 WL 5512505 (Fed. Cl. Spec. Mstr. Aug. 7, 2020) (awarding $180,000 in past pain and suffering); and *Gross v. Sec'y of Health & Human Servs.*, No. 19-0835V, 2021 WL 2666685 (Fed. Cl. Spec. Mstr. Mar. 11, 2021) (awarding $160,000 in past pain and suffering).

In this case, as Respondent notes, Petitioner's GBS treatment course was complicated by the discovery of a mass in her colon soon after she was hospitalized with GBS. A close reading of the medical records from Petitioner's 32-day hospital stay is necessary to understand how both conditions contributed to her pain and suffering. At the time of her admission on November 19, 2015, Petitioner had symptoms in addition to her GBS symptoms that caused her providers to order certain tests – a CT of her abdomen and pelvis, a colonoscopy, and a barium enema – which are not typically performed to diagnose GBS. *See* Ex. 2 at 119-22, 128, 705-06; 711-13. During this period of testing, Petitioner underwent five IVIG treatments for her GBS. *Id*. at 240; 263. Immediately following her IVIG treatments, Petitioner's GBS symptoms seemed to be worsening, prompting doctors to question whether she actually had GBS or, instead, a paraneoplastic syndrome related to the tumor in her colon. *Id.* at 274.

By November 30, 2015 (three days after finishing the IVIG treatment), Petitioner had begun to show neurological stability, or even improvement. Ex. 2 at 284. That day, she underwent partially open abdominal surgery to remove the colon mass. *Id*. at 735-41. Two days after the surgery, Petitioner's neurologist noted improvement sufficient for the hospital to "start the placement process" for discharge, suggesting that, but for Petitioner's intervening abdominal surgery, she could have been discharged from the hospital soon thereafter. *Id*. at 291, 296. But, the following day (December 3, 2015) Petitioner began to experience tachycardia,[8] and later other complications including an ileus and an anastomotic leak, which led to her move to the ICU. *Id*. at 307-08. Petitioner continued to worsen, showing signs of sepsis, until after a second abdominal surgery (which included an ileostomy) on December 5, 2015. *Id*. at 340, 345. Throughout this treatment, and through her eventual discharge on December 21, 2015, Petitioner's neurological exam remained stable or improved. *See*, *id*. at 330, 333, 356, 372, 390-91, 427-28, 453, 470.

The records clearly indicate that Petitioner's GBS had stabilized by December 2, 2015, or approximately two weeks into her hospitalization. From that date forward, other than regular neurological exams, Petitioner did not receive treatment for specifically for her GBS. Although Petitioner's filings, which include medical literature, suggest that her tachycardia and ileus was caused by her GBS, there is not preponderant evidence in the record to support that conclusion. At the time of her discharge from the hospital, Petitioner was only able to walk limited distances with a walker. Ex. 2 at 161-62. She then spent an additional 37 days in a skilled nursing facility, although Petitioner did not file the records

---

[8] One of Petitioner's treating doctors noted that it was "possible" that her tachycardia was due to GBS, but others believed it was most likely related to her abdominal surgery. Ex. 2 at 300, 333-34.

of that stay.[9] *See id.* at 2326. At the time of her discharge to home, on January 27, 2016, Petitioner was feeling better, but was easily fatigued and required a cane due to an unsteady gait. *Id.*

The comparable GBS cases cited by Petitioner involve petitioners who were awarded  between $160,000.00 and $180,000.00 for past pain and suffering. Petitioner argues that her GBS course was significantly more severe than those petitioners. Mot. at 19-21. However, Petitioner's argument relies heavily on the evidence of her ongoing symptoms, which she *attributes* to her GBS, and the emotional distress she has experienced from her inability to continue working in her former position as a part-time teacher. Thus, Petitioner's medical records after her hospitalization – as they relate to ongoing sequela vs other diagnoses – also require a careful review.

Petitioner had a third gastrointestinal surgery to reverse her ileostomy in February 2016, soon after her discharge from inpatient treatment. Ex. 2 at 2331-38. At her pre-op visit, Petitioner reported that her ability to walk had improved where she could walk up to two blocks on level ground using a cane. *Id*. She continued to have gastrointestinal symptoms, including weight loss, and still tired easily. *Id*. Petitioner reported that she stopped using a cane to walk in August 2016, as she prepared to return to work. Ex. 12 at ¶3. More than a year later, on April 3, 2017, Petitioner had a fourth surgery to repair a hernia. *Id.* at 2891. At her pre-op visit, she reported that she was walking regularly for exercise. *Id.* at 2855.

It was another six months, until October 31, 2017 – a full two years after her vaccination – before Petitioner sought further treatment for any neurological complaints.[10] Ex. 3 at 49-51. At that visit, Petitioner complained of right hip pain, lower back pain, left ankle pain, intermittent fingertip numbness, and cognitive impairment. *Id*. On exam, Petitioner had no weakness and walked well with right hip pain. *Id*. Her reflexes were normal and symmetrical. *Id*. at 50-51. She passed all cognitive testing. *Id*. at 50. The neurologist encouraged Petitioner to follow up with her PCP and referred her to a sleep clinic. *Id*. at 51. On November 1, 2017, an x-ray showed moderate arthritis in her right hip. Ex. 3 at 66-67. On November 12, 2017, Petitioner was diagnosed with obstructive sleep apnea and prescribed a CPAP machine.[11] Ex. 2 at 126. Neither of these diagnoses were related back to Petitioner's GBS.

---

[9] Petitioner described her determination during her stay in inpatient rehabilitation to improve her mobility, doing daily therapies and "learning new ways to care" for herself. Ex. 1 at ¶27-30, 32.

[10] The record confirmed that Petitioner had not seen her neurologist since January 2016, around the time that she was discharged from inpatient rehab. Ex. 3 at 49-51.

[11] Petitioner's medical records suggest that she did not use the CPAP machine. Ex. 2 at 136, 152, 156, 171.

In 2018 and 2019, Petitioner did not raise any neurologic complaints with her medical providers. On September 13, 2018, a spirometry test revealed severe obstructive airway disease with no reversibility. Ex. 4 at 37-38. In December 2019, Petitioner sought treatment for left foot pain, which she believed was caused by right leg weakness caused by her GBS. Ex. 4 at 229-30. In 2020, during a follow up for her left foot pain, Petitioner was found to have normal strength in both legs. *Id*. at 250.

Clearly, Petitioner's medical history since her flu vaccination on October 26, 2015 is complicated. However, not all of Petitioner's post-injury symptoms can be shown to be related to her GBS. Instead, the filed records support a GBS course that included an approximately two-week hospitalization (from November 19, 2015 through December 2, 2015), a 37-day stay at inpatient rehabilitation (with daily physical, and possibly, other therapies), and two neurology follow-up appointment (January 20, 2016). Petitioner did no outpatient therapies and was prescribed no medications for her GBS. Thereafter, Petitioner did not seek significant treatment[12] for GBS related symptoms at any point after her discharge from inpatient treatment, and the records described a good recovery at least through April 2017 (when she had hernia surgery).

Nevertheless, Petitioner's treatment for and recovery from GBS were very likely frustrated by her concurrent gastrointestinal surgeries - most acutely in that she was unable to participate in physical therapy during her month long hospital stay immediately after diagnosis, including while she was very ill in the ICU. This is a factor that reasonably increases her award for actual pain and suffering (if only somewhat). Petitioner has otherwise consistently described ongoing intermittent tingling in her hands and fingers and lingering fatigue. But such sequelae are not uncommon after GBS, and therefore are not a strong factor in the pain and suffering calculus. Petitioner's complaints of musculoskeletal pain and worsening fatigue from approximately April 2017 onward are more likely than not attributable to her *subsequent* diagnoses – hip arthritis, sleep apnea, and obstructive airway disease - rather than caused by her GBS.

Although I do not find that Petitioner's GBS has completely blocked her ability to work, Petitioner's illness did impact her ability to continue in her "dream job" as a teacher. At the time of her vaccination, Petitioner had recently obtained a new position, which both earned her more income and was more personally fulfilling to her than her previous employment. Ex. 1 at ¶4. Petitioner's GBS, which occurred only three months into her employment, disrupted Petitioner's career goals and caused a setback, as well as emotional distress. These impacts factor into Petitioner's actual pain and suffering.

---

[12] In fact, there are occasions where doctors ordered testing for certain symptoms, such as tingling after Petitioner's Covid-19 vaccination, that Petitioner did not complete. Ex. 3 at 389.

The cases cited by Petitioner provide an excellent range for Petitioner's actual pain and suffering, although none is factually identical. I find Petitioner's situation to be most similar to the Petitioner in *Wilson v. Sec'y of Health & Human Servs.*, No. 20-0588V, 2021 WL 5143925 (Fed. Cl. Spec. Mstr. Oct. 5, 2021). That petitioner was awarded $175,000 for his pain and suffering after a two-week hospitalization, a 35-day inpatient rehab stay, and five days of plasma exchange therapy to treat his GBS initially. *Id.* at *2. Unlike Petitioner, Mr. Wilson had to be intubated, required CPR for a cardiac arrest, and was non-ambulatory during his inpatient stay. *Id.* He required 62 physical therapy and 32 occupational therapy treatments after his discharge. *Id.* Although his initial treatment course was intense, Mr. Wilson experienced a good recovery, with full strength ten months after his vaccination. *Id.* Although he continued to experience mild sequela, including numbness and sensitivity in hands and feet, he did not return for additional treatment after his initial recovery. *Id.* at *2, 4. Ms. Ruppert had a similar hospitalization and rehab stay, but did not have the same invasive testing or substantial outpatient therapies. But Mr. Wilson's illness had no affect on his employment, as he had retired prior to his GBS, which is an important consideration.

For these reasons, I find that Respondent's recommendation of $145,000.00 is too modest, even though I accept his argument that not all of Petitioner's post-vaccination symptoms were attributable to Petitioner's GBS. Respondent's proposed figure fails to fully recognize Petitioner's experience with her initial symptoms, diagnosis, hospitalization and treatment course for her GBS, and the significant impact on her life. Rather, the "best" pain and suffering sum to be awarded is higher – though not as high as Petitioner requests.

Ms. Ruppert has also asked for compensation for future pain and suffering, both physical and emotional. However, the request is based primarily upon ongoing symptoms that I have found to be unrelated to her GBS, including fatigue,[13] cognitive deficits, left ankle pain, and worsening balance. Mot. at 21-22. Other than the fatigue, all of these symptoms began in mid-to-late 2017, almost two years after Petitioner's GBS diagnosis and treatment. Petitioner's lingering GBS symptoms, including some amount of fatigue and sensation changes in her hands, are not discounted, but can be compensated by slightly increasing her award for past pain and suffering.

Accordingly, balancing the severity of a GBS injury and Petitioner's personal loss against the relatively moderate severity of disease course and treatment requirements, and considering the arguments presented by both parties, a review of the cited cases,

---

[13] While some of Petitioner's fatigue is likely attributable to her GBS, Petitioner describes debilitating and overwhelming fatigue. *See* Mot. at 21. However, Petitioner has also been diagnosed with both obstructive sleep apnea (for which she does not appear to have followed treatment recommendations) and severe obstructive airway disease, which likely contribute to significant level of fatigue she experiences.

and based on the record as a whole, I find that **$180,000.00** in total compensation for actual pain and suffering is reasonable and appropriate in this case, with no future component.

## VI.    Appropriate Compensation for Petitioner's Past and Future Medical Expenses

Petitioners may be awarded reasonably necessary actual unreimbursable expenses that were incurred by or on behalf of the person who suffered a vaccine injury. Section 15(a)(1)(B). Future unreimbursed expenses may be paid when they are "reasonably projected to be incurred in the future." Section 15(a)(1)(A)(iii)(II); *Goldman v. Sec'y of Health & Human Servs.*, No. 16-1523V, 2020 WL 6955394, at *10 (Fed. Cl. Spec. Mstr. Nov. 2, 2020). Future unreimbursed expenses should be awarded to a degree "beyond that which is required to meet the basic needs of the injured person ... but short of that which may be required to optimize the injured person's quality of life." *Scheinfeld v. Sec'y of Health & Human Servs.*, No. 90-212V, 1991 WL 94360 at *2 (Cl. Ct. Spec. Mstr. May 20, 2991).

Petitioner seeks two categories of past unreimbursed expenses: medical mileage and housekeeping expenses. Mot. at 24-25. She has provided a spreadsheet outlining the mileage requests (Exhibit 5)2. Respondent disputes all but two entries – Petitioner's bus fare to the emergency room on November 19, 2015, and to her neurologist on October 31, 2017. Resp. at 25. As those two items are undisputed, Petitioner will be awarded the requested $8.44 for bus fare.

Several other mileage costs are also appropriate in this case. Petitioner was transferred from the hospital to inpatient rehab by her husband, rather than incurring the expense of an ambulance. Ex. 12 at 4. The trip totaled approximately 35 miles for a cost of $8.07.[14] Petitioner's husband also transferred her from the rehab facility to visit her neurologist on January 20, 2016. *Id*., Ex. 2 at 2283. The round trip was approximately 26.4 miles for a cost of $6.08. Finally, Petitioner had a comprehensive follow-up appointment after her hospitalization on March 10, 2016 for which she incurred mileage of $2.43.  These mileage expenses total $25.03 in compensation for Petitioner's past expenses, which Petitioner will be awarded.

The remainder of Petitioner's requested mileage amounts are for visits from her husband to her in the hospital and rehab facility, where he brought her items like food, clothing, and comfort items, and medical visits related to blood testing for monoclonal gammopathy of unknown significance ("MGUS"), a condition where the body makes an

---

[14] Respondent made no objection to the mileage rate proposed by Petitioner in Exhibit 52. As such, I have used the same rate herein.

abnormal protein, incidentally found during her hospitalization. *See* Ex. 12 at 5. There is nothing in the record linking the MGUS diagnosis to Petitioner's GBS. Therefore, I do not find that the remaining mileage expenses represent reasonably necessary expenses related to Petitioner's vaccine injury.

Petitioner also seeks reimbursement for $297.00 she paid to have her house cleaned on October 10, 2017 (almost two years after her vaccination). Mot. at 24. She argues that "since she was unable to clean her house for an extended period of time," she hired cleaners out of necessity. *Id*. On the receipt provided by Petitioner, she indicated that the cleaning was "needed for home sale."[15] Ex. 38. There is no evidence in the record that Petitioner hired house clearers before or after the October 10, 2017 cleaning, suggesting that ongoing cleaning was not an expense reasonably related to her GBS.  As such, I do not find that the expense was reasonably necessary due to her GBS.

Finally, Petitioner seeks compensation sufficient for her to hire a house cleaner on a monthly basis through the year 2046. Mot. at 24; Ex. 52. Petitioner argues that "she is too fatigued" to clean her own home going forward. Mot. at 24. As explained herein, however, Petitioner's overwhelming fatigue is likely only partially attributable to her GBS, and likely more substantially caused by her sleep apnea and/or obstructive airway disease. Further, other than on one occasion immediately prior to listing her home for sale, Petitioner has not hired house cleaners throughout the eight years since her vaccination, suggesting that it was not reasonably necessary, even in the acute phase of her illness. I would only permit this kind of cost in cases involving a far more severe disability than what has been established (although I fully acknowledge its seriousness). *See e.g.*, *Barone v. Sec'y of Health & Human Servs.*, No. 11-707V, 2016 WL 3577540, at *5-7 (Fed. Cl. Spec. Mstr. May 12, 2016) (allowing some in-home care for a severely-disabled clamant). Therefore, Petitioner's request for future unreimbursed expenses is denied.

## VII.    Appropriate Compensation for Petitioner's Past and Future Lost Wages

The Vaccine Act provides for an award of a petitioner's "actual and anticipated loss of earnings," where "earning capacity is or has been impaired by reason of such person's vaccine-related injury." Section 15(a)(3)(A). Compensation for lost wages "may not be based on speculation." *Moreland v. Sec'y of Health & Human Servs.*, No. 18-1319V, 2022 WL 10469047, at *3 (Fed. Cl. Spec. Mstr. Sept. 2, 2022).

First, Petitioner seeks actual lost wages from the time of Petitioner's vaccination in October 2015 through February 2020 in the total amount of $65,144.50. Mot. at 28.

---

[15] Petitioner sold her home on December 29, 2017. Ex. 34 at 8.

Respondent opposes all but $1,670.00 of that amount, representing his calculation of Petitioner's lost wages during her ten weeks of inpatient treatment. Resp. at 27. Second, Petitioner seeks future lost earnings of $123,166.09. Mot. at 28. Respondent objects to any award of future lost earnings because Petitioner's "other significant health problems . . . most likely interfered with her ability to work" after her discharge from inpatient care. Resp. at 28-29.

There is no dispute that Petitioner was unable to work between November 16, 2015 and January 27, 2016 because she was receiving inpatient treatment for her GBS and gastrointestinal symptoms. Ex. 2 at 161-62; 2326. However, Petitioner did not return to work thereafter, until August 2016, missing the remainder of the academic year in her position as a "secondary kindergarten teacher." Ex. 1 at ¶48; Ex. 29.

Although Respondent argues that Petitioner could have returned to work immediately after her discharge, Petitioner's medical records make clear that upon her discharge from inpatient rehab, her health was not improved such that she could return immediately to work (e.g. she required a cane due to her unsteady gait). *See* Ex. 2 at 2294; 2326. In February 2016, a few weeks after her discharge, Petitioner was still "ill appearing, but much improved from her hospitalization," and continued to have an unsteady gait. *Id.* at 2345-56. Further, Petitioner's prior employment was not of a nature that her position could remain fully vacant while awaiting her return. Petitioner recalled being told in May 2016 that her position has been restructured, with other staff completing her former duties. Ex. 1 at ¶41. Petitioner recalled continuing to use a cane for ambulation through August of 2016. Ex. 12 at 3.  Finally, Petitioner's surgeon stated that "it [was] unlikely that [Petitioner's] disability from March until August 2016 was due to surgical or gastrointestinal related illness." Ex. 7 at 1. These facts provide preponderant evidence that Petitioner's absence from work between November 16, 2015 and August 15, 2016 were related to her vaccine injury, and I will award Petitioner compensation for that time.[16]

Petitioner's calculation of her wages during the 2015-16 academic year requires some adjustment, however. First, Petitioner argues that she averaged 78 hours per pay period (every two weeks) at her job prior to her illness. Mot. at 25. However, Petitioner's final paystub before her hospitalization shows that she had worked a total of 412.25 hours in the 12 weeks between her start date at the job and her hospitalization, resulting in an average of *34 hours* per week. Ex. 28 at 4. Second, Petitioner's calculations use 41 weeks for the school year, and adds an additional two weeks in July for planning, an additional two weeks in August before the school year began, "Christmas pay," and paid time off

---

[16] Although it is true that Petitioner also suffered from gastrointestinal ailments during this time – including three surgeries – her most significant ongoing symptoms were fatigue and an unsteady gait, requiring the use of cane, both of which are common in the months after treatment for GBS.  While her GI ailments and surgeries may have contributed somewhat, the specific symptoms, and their impact, are appropriately attributed to GBS.

("PTO"). Mot. at 26. Petitioner's paystubs from when she returned to work reveals an employment period of 38 weeks during the 2016-17 year, 38 weeks during the 2017-18 year, and 40 weeks during the 2018-19 year. Ex. 29. Only the 2017-18 year included an August 1 start (but still a 38 week year) or any work in the month of July, which Petitioner attributes to a change in position upon her return after her illness. In addition, neither Petitioner's job offer letter nor job description outline certain of her pay expectations. *See* Ex. 15, 16. Petitioner's pay stubs for those academic years reflect bonuses received by Petitioner at the end of each calendar year, but there is no evidence in the record of any additional Christmas pay.

Finally, Petitioner included reimbursement of PTO in her calculation, but failed to provide any information regarding the PTO policies of her employer. *See* Ex. 52; Mot. at 26. I have noted in other cases that it is reasonable to reimburse a claimant for lost PTO, where a company's policy is to pay employees for days not taken as vacation or sick leave (and hence the Program reimburses the individual for having to forego this compensation). *See,* e.g., *Gross v. Sec'y of Health & Human Servs.*, No. 19-0835V, 2021 WL 2666685, at *6 (Fed. Cl. Spec. Mstr. March 11, 2021), *mot. for review den'd,* 154 Fed. Cl. 109 (2021). Here, Petitioner's offer letter indicates that PTO could be earned beginning 90 days into her employment, but Petitioner did not accrue any PTO because she became ill *before* the 90 day threshold. Ex. 15 at 1.  And there is insufficient information in the record to determine the amount of PTO Petitioner may have accrued – or even if her employer likely would have paid for these sick leave days. *See Bidlack v. Sec'y of Health & Human Servs.,* No. 20-0093V, 2023 WL 2885332, at *8 (Fed. Cl. Spec. Mstr. April 11, 2023) (citing *Gross*).

Therefore, Petitioner's compensation for her lost wages during the 2015-16 academic year will be limited to 34 hours per week for the 26 weeks she did not work. As Petitioner made $16.00 per hour during that period, her gross lost wages equal $14,144.00. Petitioner's paystubs between August and November 2015 reveal that her net income averaged approximately $13.28 per hour of work. *See* Ex. 24. Therefore, applying the same rate to Petitioner's gross lost wages, Petitioner's net lost wages during that period equals $11,739.52.00. The parties agree that, during this period, Petitioner received a total of $9,360.00 in disability benefits, which is offset against her net lost wages, resulting in an award of $2,379.52.

Petitioner's compensation for subsequent academic years is a much closer call. Respondent notes that "Petitioner has not been prescribed any treatment for any neurologic symptoms" since her discharge from inpatient care. Resp. at 28. Further, Petitioner did not return to her neurologist (and did not visit any other provider) until October 31, 2017, over two years after her vaccination, with any complaints of possible ongoing GBS symptoms. Ex. 3 at 49-51. It was only at this point that Petitioner began to

seek additional care for her fatigue, along with new right hip and left foot pain and cognitive deficits she attributed to her GBS. *See id.* at 31. Her additional diagnoses – sleep apnea, right hip arthritis, and obstructive airway disease – which explain those symptoms, were not obtained until at least late 2017. Before her symptoms began to worsen after her hernia surgery in April 2017 (at which time she reported walking regularly), Petitioner's lingering fatigue was reasonably attributed to her GBS. But once other medical conditions were found that most likely contributed to (and likely heightened) Petitioner's inability to work, specifically her worsening and debilitating fatigue and her right hip pain, which forced her to return to using a cane, the balance shifted to the point where Petitioner's GBS was no longer the likely cause of her reduced ability to remain employed in her employment. For these reasons, I will award Petitioner only lost wages for the 2016-17 academic year. Petitioner's request for actual lost wages during the 2017-18, 2018-19, and 2019-20 academic years is denied.

During the 2016-17 school year, Petitioner worked a reduced schedule, averaging 20.5 hours per week. *See* Ex. 29 at 2-22. She earned $17.00 per hour during this period. *Id*. Based on her pre-vaccination average of 34 hours per week[17] for 38 weeks during the year, Petitioner should be compensated in the gross amount of $8,500.00. Petitioner's paystubs between August 2016 and June 2017 reveal that her net income averaged approximately $14.67 per hour of work. *See* Ex. 24. Therefore, applying the same rate to Petitioner's gross lost wages, Petitioner's net lost wages during that period equals $7,335.00.

Finally, Petitioner seeks future lost wages through her age 67. Mot. at 28. She argues that she is unable to continue working as a secondary kindergarten teacher because "she is now susceptible to vaccine reactions, specifically Covid-19, flu, and measles," and is "unable to get fully vaccinated." *Id*. Petitioner argues that "it is reasonable to expect that Petitioner would have worked as a secondary kindergarten teacher at [her previous employer]" through that time. *Id*.

The record, as filed, supports the conclusion that Petitioner can only no longer receive the flu vaccine, but can receive measles and Covid-19 vaccinations. On October 19, 2017, Petitioner sought an exemption from flu vaccination from her PCP, which was provided.[18] Ex. 3 at 25. At the same time, Petitioner's immunity to measles was tested and found to be "borderline." *Id*. The doctor specifically approved Petitioner being vaccinated against measles and ordered the vaccine. *Id*. at 25, 28. Petitioner later refused

---

[17] Petitioner missed 13 hours of work in August 2016 due to the death of her husband, which are subtracted from the total number of hours awarded. *See* Ex. 1 at ¶53; Mot. at 26.

[18] In September 2019, Petitioner again requested a letter excusing her from getting a flu shot, and also excusing her from getting a tuberculosis test. Ex. 4 at 213. Her PCP confirmed that "due to GBS, she cannot get flu shot," but noted that "Tb test has nothing to do with GBS." *Id*.

the measles vaccine. *Id.* at 36. On November 1, 2017, Petitioner visited her PCP for an annual exam, at which time the doctor wrote a letter stating that she could not receive the measles vaccine "due to medical reasons." *Id.* at 66-76. The record of that visit does not contain any discussion of the measles vaccine, nor any explanation for why the doctor provided the letter after her previous assessment. *Id.* The doctor's initial assessment that Petitioner should be vaccinated was based on objective testing – a blood test – and the record specifically states that Petitioner's PCP consulted with an infectious disease specialist (Dr. Tempesta). *Id.* at 25. Thus, there is not preponderant evidence supporting the change in opinion after the doctor saw Petitioner on November 1, 2017, I do not find that the letter alone negates the previous medical record.

In March 2021, Petitioner returned to her allergist for advice about whether she should receive the Covid-19 vaccine. Ex. 13 at 247-52. She was advised to get the vaccine. *Id.* On May 6, 2021, Petitioner received the first dose of a Covid-19 vaccine, after which she described numbness/tinging throughout her body. Ex. 13 at 364. In response to Petitioner's concerns, her PCP reassured Petitioner, stating that the "CDC does recommend [the] vaccine for patients with [a] past hx of GBS syndrome," and encouraged her to get the second dose of the vaccine. *Id.* Petitioner did not receive any further Covid-19 vaccinations and confirmed in her affidavit that she is "unwilling to be vaccinated." Ex. 1 at ¶69. Thus, Petitioner is not medically barred from vaccination against Covid-19.

Even if Petitioner were unable to be vaccinated fully, such that she could not at all be employed in her preferred career, her future lost wage demand is too speculative to be awarded. First, Petitioner argues that she would have continued to work at her previous employer until she was 67 years old. But the school where she was employed dissolved as of the end of 2021, suggesting that Petitioner's time there could not extend beyond that date, and certainly not indefinitely. *See* https://opencorprates.com/compames/us_ca/3276655. Further, Petitioner has provided no evidence regarding any other employment she might be able to perform other than her "dream job." Finally, to the extent that Petitioner argues that her ongoing symptoms prevent her from working (separately from the vaccination issue), I have found that her GBS related sequelae stopped preventing her from working only for a defined period in the past ( as of April 2017, or at least at the end of the 2016-17 school year). For the foregoing reasons, Petitioner request for future lost wages is denied.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I award Petitioner a lump sum payment of $189,739.55, representing $180,000.00 for her actual pain and suffering, $25.03 for past unreimbursed**

**expenses, and $9,714.52 for past lost wages.** These amounts represent compensation for all damages that would be available under Section 15(a) of the Vaccine Act.

The Clerk of Court is directed to enter judgment in accordance with this Decision.[19]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[19] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.